IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Marcia S. Krieger

Civil Action No. 17-cv-00882-MSK-STV

ROBERT HAMILTON,

     Plaintiff,

v.

IRA H. GROLMAN, as Personal Representative of the Estate of Ian Kemper,

     Defendant.

---

## OPINION AND ORDER  GRANTING IN PART AND DENYING IN PART MOTIONS TO EXCLUDE TESTIMONY UNDER FED. R. EVID. 702

---

**THIS MATTER** comes before the Court pursuant to several motions by both parties (**#133-138**) seeking to exclude testimony from witnesses proffered by the other side pursuant to Fed. R. Evid. 702.  The Court has considered the motions and the opposing party's responses (**#142, 145-149**).[1]  This case was transferred from the United States District Court for the Southern District of California.  The Court exercises jurisdiction pursuant to 18 U.S.C. §1332.

## FACTS

The precise circumstances giving rise to the incident in this case are in some dispute, as discussed in more detail below.  It is sufficient to observe that, during the evening of March 17, 2014, Mr. Hamilton was driving westbound in Interstate 70 near Georgetown, Colorado.  Mr.

---

[1] Also pending is the parties' Joint Motion for Extension of Time (**# 141**) to file responses. Since the responses have been filed, the motion is granted, nunc pro tunc.  There are also pending motions at Docket # 118 and 119 which are predecessors to the motions presently before the Court. Those motions are denied as moot.

Hamilton was driving a pickup truck and towing a 22-foot long flatbed utility trailer.  The conditions were icy and snowy.  At some point, Mr. Hamilton lost traction and his vehicle came to a stop.   Mr. Kemper, driving a passenger car, struck the trailer portion of Mr. Hamilton's vehicle.  Mr. Hamilton claims to have suffered injuries as a result of the accident and brings this action against Mr. Kemper's estate,[2] asserting claims sounding in negligence.

Both sides have designated various witnesses to provide opinion testimony pursuant to Fed. R. Evid. 702.  Each side has filed several motions (**# 133-138**) seeking to exclude some or all of the designated witnesses' opinions.

## ANALYSIS

The Court will dispense with a recitation of the witnesses' opinions, the objections thereto, and the governing principles of Rule 702, except as may be necessary in the discussion *infra*.  The Court takes the witnesses in the order in which their testimony becomes relevant chronologically.

### A.  Winthrop Smith (Docket # 134)

Mr. Hamilton has proffered Winthrop Smith, an accident reconstructionist, to give testimony regarding the circumstances of the accident, and more specifically, to calculate the the physical and biomechanical forces that occurred during the accident.  Mr. Kemper challenges what he has designated as Opinions 1-3 by Mr. Smith.[3]  Those opinions are:

---

[2]    Mr. Kemper passed away from unrelated causes after the commencement of this action. Although Mr. Grolman has been substituted as Personal Representative of Mr. Kemper's estate, for purposes of convenience, the Court will refer to the Defendant as "Mr. Kemper" for purposes of this Opinion.

[3]    Mr. Kemper's motion identifies 4 opinions, but repeats Opinion 3 twice.

**Opinion 1**:  "The longitudinal Delta-V (change in velocity) of [Mr. Hamilton's] truck . . . was most likely 7.5 mph or greater.  This represents an increase in velocity from back to front as a result of the impact of [Mr. Kemper] into his trailer."

**Opinion 2**: "The lateral Delta-V of [Mr. Hamilton's] truck was most likely 10.9 mph or greater.  This represents an increase in velocity from right to left as a result of the impact of [Mr. Kemper] into his trailer."

**Opinion 3**: "The minimum (lower bound) peak longitudinal acceleration imparted to [Mr. Hamilton's truck] was most likely 6.8 G.  Likewise, the minimum (lower bound) peak lateral acceleration imparted to [Mr. Hamilton's truck] was most likely 9.9 G."

Mr. Kemper argues that Mr. Smith's opinions should be excluded under Rule 702 because: (i) Mr. Smith lacks "sufficient, reliable facts to support his opinions," namely that Mr. Smith erroneously relies upon the conclusion that Mr. Hamilton's vehicle was facing westbound at the moment of impact, despite evidence that suggests that the vehicle was facing some other direction; (ii) that Mr. Smith failed to adequately apply his methodology, in that he applied an incorrect variable when calculating the Delta-V figures in Opinions 1 and 2.[4]

1. <u>Position of Mr. Hamilton's truck</u>

It appears to be undisputed that Mr. Smith based his calculations on a conclusion that Mr. Hamilton's truck was facing westbound (*i.e.* straight down the highway) when Mr. Kemper's

---

[4]      Mr. Kemper also argues that Mr. Smith's opinions should be excluded because Mr. Smith refused to answer certain questions at his deposition about his understanding of the accident. This argument does not implicate Fed. R. Evid. 702 or any other evidentiary rule governing the admissibility of Mr. Smith's opinions.  At best, it is an argument that Mr. Hamilton failed to adequately disclose the bases for Mr. Smith's opinions under Fed. R. Civ. P. 26(a)(2) or improperly limited Mr. Smith's deposition in violation of Fed. R. Civ. P. 30(d)(3), but Mr. Kemper did not file a motion seeking to compel further discovery from Mr. Smith during the discovery period in this case.  Because discovery has now concluded, the Court deems Mr. Kemper to have waived such objections.

vehicle struck the trailer.  Mr. Smith testified at his deposition that he derived his conclusions about the position of Mr. Hamilton's truck based on Mr. Hamilton's deposition testimony.  The record reflects that Mr. Hamilton gave a deposition on January 2, 2018 in which he testified:

> A: When I was at a complete stop, I was straight in a straight line.  Straight.  The fishtailing [of the trailer] and stuff happened before I came to the complete stop, and then his car came up.
>
> Q:  And you're saying before Mr. Kemper's car came on the scene, you got it all straightened out and both your truck and your trailer were pointed straight down the highway?
>
> A: That's exactly what I'm telling you.  Because I was talking to the guy right there, and I was straight as a jaybird.

There is, however, other evidence in the record that posits a different position for Mr. Hamilton's truck at the time of impact.  For example, the police report for the accident contains a diagram of the accident that depicts Mr. Hamilton's truck as facing northbound at the "POI" – point of impact – with the trailer jack-knifed at a 90° angle and oriented east-west.  *Docket* # 134-6 at 4.  Mr. Hamilton also gave a deposition on January 28, 2015 in another matter in which he testified that the accident occurred when "the trailer jackknifed to the left into the other lane."  Thus, there is conflicting evidence in the record as to what direction Mr. Hamilton's vehicle was facing at the time of the accident.

That conflicting evidence does not prevent Mr. Smith from choosing one version of events and rendering an opinion as to the forces at play in that version.  Rather, Mr. Smith has <u>assumed</u> the fact that Mr. Hamilton's vehicle was facing westbound.  This Court discussed this situation in *U.S. v. Crabbe*, 556 F.Supp.2d 1217, 1224 (D.Colo. 2008), stating:

> Reliance on assumptions does not necessarily preclude the opinion from having an adequate foundation under Rule 702. The accuracy of the assumption is not at issue for Rule 702 purposes, but the importance of the assumption may be. Depending on the case, the assumed fact may be so critical to the methodology that the

witness' failure to ascertain the actual fact would render the application of the facts to the methodology unreliable; in such circumstances, the opinion would fail under Rule 702. On the other hand, the assumed fact may be sufficiently peripheral to the analytical process that the experts in the same field would not hesitate to assume the fact's presence or absence when applying the methodology. The accuracy of the assumption is an issue for trial because it affects the weight of the opinion. If the assumption is necessary for application of the methodology, an opponent may attempt to disprove the assumed fact at trial. If the opponent is successful, the failure of the assumption may vitiate the expert's opinion.

The record does not reflect that Mr. Smith's methodology for calculating physical forces is "so critical" that that methodology becomes unreliable in any other factual scenario. Put differently, it does not appear that the methodology that Mr. Smith applied – the specific formulas and calculations[5] --can only be applied if Mr. Hamilton's truck was facing westbound. Rather, it appears that Mr. Smith simply applied the standard formulas that accident reconstructionists would use when calculating forces in an accident where both vehicles were traveling (or at least oriented) in the same direction. The assumption that Mr. Hamilton's vehicle was pointed westward at the time is simply that: a fact Mr. Smith assumed to be true, but as to which he has no personal knowledge. As the Court explained in *Crabbe*, the accuracy of his assumption is one for the jury to consider when giving weight to the opinion as a whole. If the jury credits Mr. Hamilton's testimony that his truck was facing westbound at the moment of impact, the jury may choose to credit Mr. Smith's calculations of the forces at play in that circumstance. On the other hand, if the jury disbelieves Mr. Hamilton's contention that his

---

[5]     It is not abundantly clear what Mr. Smith's specific methodology was – that is, what formula he used and what variables he considered. His report states only that he "appli[ed] the laws of physics," and the portions of Mr. Smith's deposition testimony in the record do not materially elaborate. Nevertheless, the Court can reasonably assume that the physical formula he applied is agnostic to the specific cardinal direction that a vehicle was facing.

vehicle was facing westbound, the Court is confident that the jury will entirely disregard Mr. Smith's opinions, because those opinions are based on an assumption that was shown to be incorrect.

Accordingly, the Court rejects Mr. Kemper's challenge to Mr. Smith's opinions based on his assumptions about the position of Mr. Hamilton's truck.

### 2. Error in applying the methodology

Mr. Kemper's second argument is that Mr. Smith "made significant miscalculations in his spreadsheet" that he used to derive his opinions. More specifically, Mr. Kemper alleges that Mr. Smith "should [have used] a Delta V" figure at a certain point in his calculations, "not the closing speed of [Mr. Kemper's car." Mr. Kemper argues that a corrected calculation would produce results "less than half of [Mr. Smith's] erroneously reported numbers."

The Court's ability to assess Mr. Kemper's argument is hampered by the inadequacy of the record on both sides. Mr. Kemper's motion refers to a spreadsheet prepared by Mr. Smith, but Mr. Kemper has not submitted a copy of that spreadsheet, and the portions of Mr. Smith's deposition testimony that Mr. Kemper has filed make no reference to the spreadsheet or the alleged computational error. Simply put, all that the Court has to support Mr. Kemper's motion is Mr. Kemper's counsel's representations of fact. Similarly, Mr. Hamilton's response to Mr. Kemper's motion dos not attach the spreadsheet, nor does it address Mr. Kemper's argument about a computational error at all. It is axiomatic that Mr. Hamilton, as the proponent of Mr. Smith's opinions, bears the burden of proof that those opinions are admissible. *U.S. v. Banks*, 761 F.3d 1163, 1200 (10th Cir. 2014). But it is equally axiomatic that, as the party raising an objections to admissibility, Mr. Kemper has the burden of making at least a *prima facie* showing that a question of admissibility exists before Mr. Hamilton will be put to his own burden of

proof.  Because the Court is unable to even evaluate the factual predicate of Mr. Kemper's

motion based on the record herein, the Court is compelled to conclude that Mr. Kemper has not

made his *prima facie* showing that a question of admissibility arises with regard to Mr. Smith's

calculations.

Accordingly, Mr. Kemper's motion to exclude Mr. Smith's opinions pursuant to Fed. R.

Evid. 702 is denied.

**B.  Carrie Jackson (Docket # 135)**

Mr. Kemper was arrested at the site of the accident and transported to a Colorado State

Patrol office in Golden, Colorado.  Several hours after the accident, Corporal Carrie Jackson

performed a "Drug Recognition Examination" on Mr. Kemper.  Ms. Jackson concluded that, at

that time, Mr. Kemper was "impaired beyond the slightest degree by cannabis and a narcotic

analgesic[ ] and [was] unable to operate a vehicle safely."  Mr. Kemper moves to exclude Ms.

Jackson's opinion pursuant to Rule 702, arguing that: (i) Ms. Jackson lacks sufficient

qualifications to render that opinion, as she testified that she was not yet certified to perform

such examinations at that time and had only completed four of them; (ii) that Ms. Jackson lacked

reliable facts and data because her evaluation of Mr. Kemper occurred several hours after the

accident; and (iii) that Ms. Jackson is not competent to testify about her observations during the

examination because she admitted she lacks a specific recollection of that examination.[6]

Mr. Hamilton's response argues that he is <u>not</u> proffering Ms. Jackson as a witness

pursuant to Rule 702.  Rather, he contends, he is proffering he opinion as a lay witness pursuant

---

[6]     Mr. Kemper's motion also refers to Ms. Jackson's lack of knowledge about the chain of custody involving a blood sample taken from Mr. Kemper.  The Court does not understand Mr. Hamilton to proffer Ms. Jackson to offer any opinions based on the blood sample, and thus, the Court does not reach this argument.

to Fed. R. Evid. 701.  Mr. Hamilton's argument is somewhat unclear as to whether he is simply purporting to offer Ms. Jackson as a percipient witness – that is, one who will testify only to what she personally observed about Mr. Kemper at the time (*i.e.* "her personal observations of Mr. Kemper . . . look[ing] at pupil sizes, blood pressure, muscle tone, [and his] physical response to several psychophysical testimony indicators of impairment. . . .") – or whether he also intends to have her render the "lay" opinion that Mr. Kemper was "impaired . . . by cannabis and a narcotic analgesic."

Two questions are presented for resolution here: (i) whether Ms. Jackson may give "lay opinion" testimony pursuant to Rule 701 that Mr. Kemper was "impaired" on the evening of March 17-18, 2014; and (ii) whether Ms. Jackson may testify as a percipient witness about her personal observations of Mr. Kemper's appearance and manner on that evening.

The Court quickly disposes of the first question, concluding that the opinion by Ms. Jackson that Mr. Hamilton has identified – that he was "impaired by cannabis and a narcotic analgesic" – is not an appropriate subject for lay opinion testimony under Rule 701.  Lay opinions are admissible within Rule 701 if they are "not based on scientific, technical, or other specialized knowledge" and "could be reached by any ordinary person."  A witness reaches an admissible lay opinion "from a process of reasoning familiar in everyday life," not based on any particular training.  *U.S. v. Bishop*, 926 F.3d 621, 627 (10th Cir. 2019).  Here, Ms. Jackson examined Mr. Kemper and reached opinions about the nature and extent of his impairment based on her training as a Drug Recognition Examiner ("DRE"), not using the ordinary skills and reasoning she applies in everyday life.  She testified that "I have all this knowledge out of a book" – namely, her DRE training courses – "and I'm going to apply it in a real-life situation."  Notes from Ms. Jackson's evaluation reflect that she applied a wide array of tests to Mr.

Hamilton, including numerous "psychophysical indicators of impairment" such as a Modified Romburg Balance Maneuver test, Walk and Turn test, and One-Leg Stand test; measurement of Mr. Kemper's "clinical indicators," including his pulse, blood pressure, body temperature, and pupil measurements, as well as test for horizontal and vertical gaze nystagmus; examination of his sinuses, tongue, and muscle tone, among other observations.  An ordinary person – say, a parent examining a late-arriving teenage child for intoxication – lacking in scientific training in drug recognition, would be unlikely to be so thorough.  That parent might examine the teenager's general balance, speech, and eyes, but is unlikely to pull out a thermometer, sphygmometer, and various other scientific tools to make that assessment.  Thus, it is clear to the Court that any opinions Ms. Jackson reached about Mr. Kemper's possible impairment were made based on her specific training, not simply on everyday lay observations that any ordinary person might make. As such, her opinions about Mr. Kemper being impaired are not admissible under Rule 701.

The question of whether Ms. Jackson may give percipient testimony – *e.g.* that she observed Mr. Kemper to have difficulties with balance, to be "thick tongued" in speech, and to have bloodshot eyes – is not as well-developed.  Arguably, such observations in and of themselves may be probative of potential impairment, and a jury might conclude from those observations alone that Mr. Kemper might have been impaired.  The question of whether Ms. Jackson's DRE training might have influenced her observation and evaluation of those conditions raises concerns that allowing her percipient testimony might implicate Fed. R. Evid. 403, but that issue has not been addressed or discussed by the parties.  Moreover, as Mr. Kemper notes, Ms. Jackson testified at her deposition that she had no present recollection of observing him.  Arguably, it might be possible that Ms. Jackson's recollection could be refreshed under Fed. R. Evid. 612, but the Court cannot assume from the instant record that such refreshment

would be effective.  Thus, the Court makes no ruling as to whether Ms. Jackson may testify simply as a percipient witness.  Should Mr. Hamilton offer her at trial for that purpose, Mr. Kemper is free to raise any appropriate objections to that testimony at that time.

Accordingly, the Court grants that portion of Mr. Kemper's motion that seeks to exclude opinion, as distinguished from percipient, testimony from Ms. Jackson.

### C.  Marvin Pietruszka (Docket # 136)

Colorado Highway Patrol officials took a blood sample from Mr. Kemper and tested it for indicia of Mr. Kemper's consumption of various drugs.  Mr. Kemper's blood yielded evidence of THC at a concentration of 5.9 ng/ml.  Mr. Hamilton then retained Marvin Pietruszka, a toxicologist, to opine as to whether those results indicate whether Mr. Kemper was under the influence of marijuana at the time of the accident.  According to Mr. Kemper, Mr. Pietruszka's report contains three opinions[7]:

**Opinion 1:** that the blood test results "demonstrate the presence of low levels of active THC, [they] do not reflect the higher levels of THC that would have been measured at the time of the subject accident."

**Opinion 2:** "Mr. [ ] Kemper's blood test results do not necessarily reflect the ongoing effect via cannabinoid receptors in the central nervous system."

───────────────────────

[7]     Mr. Kemper's motion notes, in passing, that during his deposition, Mr. Pietruska offered several additional opinions about Mr. Kemper's potential marijuana and opioid impairment.  In a single sentence in his motion, Mr. Kemper argues that these additional opinions are "not in any Rule 26 disclosure report, violate the Rule 26 disclosure requirements for retained experts, and as such are inadmissible."  Mr. Hamilton's response to the motion does not address these particular opinions in any detail nor respond to Mr. Kemper's Rule 26 argument.

The Court finds that the additional "opinions" discussed by Mr. Pietruszka are, in actuality, simply explanations of Mr. Pietruszka's methodology or elaborations on the reasoning supporting his Opinions 1-3, not independent opinions that had to be separately disclosed.  Thus, the Court limits its analysis to Opinions 1-3 set forth above.

**Opinion 3:** "Mr. [ ] Kemper was driving under the influence of marijuana and a low level of opiates at the time of his involvement in the accident."

Mr. Kemper moves to exclude Mr. Pietruszka's opinions pursuant to Rule 702 on the grounds that: (i) Mr. Pietruszka acknowledged that "it is not possible to extrapolate an earlier blood level of THC . . . based on a later test," and thus, Opinion 1 lacks a reliable methodology; (ii) Opinion 2 "is not an opinion that bears on [Mr.] Kemper's level of intoxication and is not expressed as a scientific probability"; and (iii) that Mr. Pietruszka relied upon inaccurate studies to formulate his conclusion that Mr. Kemper was impaired in Opinion 3.

    1.  <u>Opinion 1</u>

Mr. Kemper contends that, by Mr. Pietruszka's own admission, Opinion 1 lacks a reliable methodology. The crux of Opinion 1 is that although Mr. Kemper's blood had 5.9 ng/ml of THC when tested approximately 5 hours after the accident, it is possible that "higher levels of THC [could] have been measured at the time" of the accident itself. At Mr. Pietruszka's deposition, the following exchange occurred:

> Q: You can't take the 5.9 nanogram of Mr. Kemper's sample and extrapolate that back accurately to the time of the accident and predict what his blood level THC would have been at the time of the accident; is that correct?
>
> A: That's correct. You cannot do that.
>
> [. . . ]
>
> Q: You can't describe a formula to predict the level or the rate of metabolism of THC in someone's bloodstream the way you can with alcohol—
>
> A: That's correct.
>
> Q: -- is that right?
>
> A: That's correct.

Thus, it appears that Mr. Pietruszka acknowledged that the implication in Opinion 1 – that the amount of THC found in the tested blood sample may have been lower than the actual amount of THC in Mr. Kemper's blood at the time of the accident 5 hours earlier – is not scientifically valid.

Mr. Hamilton's response to Mr. Kemper's motion does not point to any evidence in the record that demonstrates a valid methodology by which Mr. Pietruszka reached Opinion 1 nor proffer an interpretation of Opinion 1 that is supported by the evidence in the record. Accordingly, the Court grants Mr. Kemper's motion and finds that Mr. Pietruszka's Opinion 1 should be excluded pursuant to Rule 702.

2.  Opinion 2

The Court has some doubt as to whether Opinion 2 is an "opinion" at all.  Rather, it appears to be a statement of fact: that test results showing THC concentration in <u>blood</u> does not necessarily reflect whether or not there are ongoing effects on cannabinoid receptors in a person's <u>nervous system</u>.  But assuming that this is an opinion by Mr. Pietruszka, Mr. Kemper's motion essentially argues that even if Opinion 2 is "based on speculation" because Mr. Pietruszka "has no facts the conclude that [Mr.] Kemper's nervous system was being affected at the time of the subject accident.  Mr. Kemper thus argues that Opinion 2 "is not helpful to the jury in this case and should not be admitted."

The Court disagrees.  Opinion 2 is essentially a caution to the factfinder that blood test results demonstrating the presence of THC are not necessarily a proxy for establishing whether the subject was presently (or recently) impaired by cannabis use.  If anything, it is helpful to the jury in deciding how much weight to give the fact that Mr. Kemper's blood test revealed THC concentrations; Mr. Pietrusza's Opinion 2 essentially suggests that the jury should give minimal

weight to (if not disregard entirely) that fact in deciding whether Mr. Kemper was physically impaired at the time of the accident.  Although Mr. Pietruszka goes on to opine in Opinion 3 that Mr. Kemper was actually impaired by cannabis use at the time of the accident, that discrete opinion does not bear on the admissibility of Opinion 2 itself.  The Court finds that Opinion 2 is not excluded under Rule 702.

### 3. Opinion 3

Mr. Kemper argues that Mr. Pietruszka relied on unreliable science in reaching Opinion 3 – that Mr. Kemper was actually impaired by cannabis[8] at the time of the accident.  The contours of Mr. Pietruska's Opinion 3 are clarified by Mr. Pietruszka's report (and essentially repeated in his deposition testimony).  In his report, Mr. Pietruszka appears to base his conclusion that Mr. Kemper was impaired by cannabis at the time of the accident not on the blood test itself, but on other facts, most significantly: (i) "eye tracking performance is disrupted by cannabis smoking and its effects and be observed up to 24 hours after smoking a single cannabis cigarette"[9]; and (ii) that "the findings of ocular hyperemia, confused slowed speech, and slowed body movements [by Ms. Jackson] . . . is highly suggestive of a central nervous system effect of a toxic substance such as cannabis."  Although Mr. Kemper takes issue with certain studies that Mr. Pietruszka mentioned during his deposition, Mr. Kemper's motion does not allege that the two facts mentioned above – that marijuana use may affect eye tracking performance for a period of up to 24 hours and that percipient observation of Mr. Kemper after the accident was suggestive of nervous system impairment – themselves lack a scientific validity. Certainly, Mr.

---

[8]     Mr. Kemper's motion makes no mention of that portion of Mr. Pietruska's Opinion 3 that mentions opioids, and thus, the Court does not consider that portion of Opinion 3.

[9]     Mr. Kemper admitted to police that he had smoked cannabis sometime between 10 a.m. and noon on March 17, roughly 10-12 hours before the accident occurred.

Kemper has not come forward with his own toxicology expert to testify that Mr. Pietruszka's methodology or underlying assumptions are discredited within the toxicology community.[10]

Accordingly, the Court finds that Mr. Kemper has not demonstrated that Mr. Pietruszka's Opinion 3 should be excluded under Rule 702.

### D.  Henry Lubow (Docket # 137) and Andrew Morris (Docket # 138)

Both sides have designated witnesses to opine as to the reasonableness of medical bills that Mr. Hamilton has incurred to date.[11]  Mr. Hamilton designated Andrew Morris, and Mr. Kemper identified Henry Lubow.

---

[10]    Mr. Kemper invites the Court to review a 2105 study, Docket # 136-5, and conclude that, as a result, Mr. Pietruszka's opinions "are not based on reliable statistical evidence or sound scientific methodological principles."  The Court need not explore this issue in great depth.  The study Mr. Kemper cites concludes that "[no] definitive conclusions about drug use and crash risk can be reached" and that "the established body of scientific evidence on the subject of drug impairment indicates that in some situations, drugs other than alcohol can seriously impair driving ability."  At best, then, Mr. Kemper has come forward with evidence that can provide a basis for cross-examination of Mr. Pietruszka, and support an argument to the factfinder that it should give limited weight to his opinions.

[11]    Both parties appear to assume that this inquiry is guided by *Howell v. Hamilton Meats & Provisions, Inc.*, 257 P.3d 1130 (Cal. 2011).  In *Howell,* the California Supreme Court held that where a provider of medical services to a tort victim accepts, as full payment for the provider's services, a discounted sum negotiated in a preexisting contract with the tort victim's health insurer, the tort victim may not recover from the tortfeasor "the undiscounted sum stated in the provider's bill but never paid by or behalf of the" victim.  257 P. 3d at 1133.  In other words, under California law, "the amount of the 'full bill' for past medical services is not relevant" and "the amount or measure of economic damages for an uninsured plaintiff typically turns on the reasonable value of the services rendered." *Pebley v. Santa Clara Organics, LLC*, 232 Cal.Rtpr.3d 404, 406 (Ca.App. 2018).

This action was initially commenced by Mr. Hamilton in federal court in California, based on diversity of citizenship, and venue was transferred to this Court primarily based on convenience to witnesses.  In federal diversity actions where venue has been transferred for purposes of convenience, the transferee court (here, the District of Colorado) nevertheless applies the substantive law of the transferor state (here, California).  *Ferens v. John Deere Co.*, 494 U.S. 516, 523 (1990).

Mr. Morris is a chiropractor, as well as the owner, operator, and manager of "multidisciplinary medical practices, outpatient ambulatory surgical centers, and [a] healthcare management company," through which he "provides coding and billing services for medical practices." Mr. Morris did not file a traditional expert report; rather, he submitted a spreadsheet reciting each line item of medical treatment that Mr. Hamilton claimed related to the accident, the amount billed by the provider, and a column identifying the "usual & customary cost/value" of that line item. Where the amount billed exceeded the "customary cost," Mr. Morris reduced the amount billed to the customary cost; where the amount billed was less than the customary cost, Mr. Morris retained the amount billed.

The method by which Mr. Morris determined the "customary cost" of a given item of medical treatment is not described in any report. Rather, the Court's understanding of Mr. Morris' methodology comes from Mr. Morris' deposition testimony. Mr. Morris explained that his figures come from two sources. First, he relied on "19 years' experience billing for [and] receiving payments for" his healthcare management company and the various medical practices it supports. He stated that "my day-in/day-out business is reviewing claims data, both billing for and collecting payments from healthcare carriers" and various other payors. Second, he "cross-reference[d] statistically-credible database sources" that collect medical billing information. For example, he could "choose, like a source" – he gave an example of "a Medicare fee schedule" and could then "pick a 75th percentile" figure from that schedule. Mr. Morris explained that both relying solely on his experience and relying on a just a single database could yield inappropriate results, so he "use[d his] expertise as well as sources to create [a] foundation for" his opinions. (As discussed below, however, it does not appear that Mr. Morris strictly followed this

methodology.)  Mr. Morris opined that the reasonable value of the medical services Mr.

Hamilton has received to date is approximately $237,000.

Mr. Kemper designated Mr. Lubow as a rebuttal expert to respond to Mr. Morris'

opinions.  Mr. Lubow states that he determines the "reasonable value" of medical services to be

"the amount for which it is usually available in the subject community."  Mr. Lubow first

compared each line item to two "benchmark" values: (i) the full amount allowed for the service

under Medicare billing rates and (ii) a figure that is 130% of the Medicare-allowed amount,

which reflects the "average group health payment" amount.  Mr. Lubow chose these benchmarks

because most medical providers typically agree to accept one or both as full payment for most

services.  Mr. Lubow also compared his figures to certain other databases of medical pricing: (i)

a Published Cash Prices list distributed by a consortium of healthcare providers in the Los

Angeles area (where Mr. Hamilton received much of the treatment at issue), intended to promote

transparency in medical billing[12]; (ii) the American Hospital Directory database, which "collects

a wide range of data from U.S. hospitals" including average charges for various services; and

(iii)  the FAIR Health database, which collects data "showing the range of fees charged in each

geographic area, arranged into percentiles."  It is not completely clear to the Court how Mr.

Lubow applied these various comparators to the charges actually reported by Mr. Hamilton; it

appears that the bulk of Mr. Lubow's application of his methodology is reflected in a spreadsheet

that, as best the Court can determine, is not part of the record.  Mr. Lubow opines that the

reasonable value of medical services provided to Mr. Hamilton is between approximately

$70,000 and $85,5000.

---

[12]     Mr. Lubow notes that "the cash rates are dramatically lower than the amounts that are
usually charged when a third-party payer is billed," but also states that "many of the cash rates
approximate" the benchmark amounts he calculated.

1. <u>Challenge to Mr. Morris</u>

Mr. Kemper challenges Mr. Morris' opinions regarding reasonable value under Rule 702 on the following grounds: (i) that Mr. Morris, as a chiropractor, lacks the qualifications necessary to render the opinions; (ii) Mr. Morris' reliance on his experience and his rejection of the FAIR Health database ranges constitute an unreliable methodology; and (iii) Mr. Morris' decision to use the amount billed if that amount is lower than the reasonable charge is itself an unreasonable methodology because even those amounts can be unreasonable if they exceed the highest percentiles in the FAIR Health database.

The Court can dispense quickly with Mr. Kemper's challenge to Mr. Morris' qualifications. As Mr. Hamilton's response makes clear, it is not Mr. Morris' status as a chiropractor that qualifies him to render his opinions; it is his lengthy experience in healthcare management, billing, and collections. Mr. Kemper makes no argument that Mr. Morris' 19 years of experience in healthcare management, billing, and collections is insufficient to permit him to render opinions regarding medical billing, nor has Mr. Kemper adduced any evidence to suggest that persons in the field of medical billing analysis would be expected to have something more than 19 years' experience before opining on such matters. Because the Court cannot say that 19 years of experience in medical billing is *prima facie* insufficient to qualify Mr. Morris to render the opinions here, the question of his qualifications is one for the jury to assess in deciding how much weight to give Mr. Morris' opinions.

The challenge to Mr. Morris' methodology is more concerning, however. Mr. Morris described a methodology that had two components: a calculation of each service's customary cost that he derived from his personal experience in medical billing and collections, and resort to various databases that collect and report medical charges and costs in various geographic

17

regions.  Mr. Morris testified that simply relying on one method or the other would not yield

reliable opinions:

> if I just determine cost based on my 19 years' experience, actually doing this for a living all day every day, <u>then it's just in my head and I didn't have a source</u>.  And then if I just choose like a source and pick a 75th percentile or, let's say, a Medicare fee schedule – I just think Medicare's fee scheduled is reasonable, but you have no experience, <u>that would be a bad thing too</u>.  And so I use my experience as well as sources to create a foundation for my opinions.  (Emphasis added.)

Notably, Mr. Morris did not testify as to <u>how</u> he selected data from the database sources

to compare to his own experiential estimates.  He did not, for example, decide that the 75th

percentile cost for each given procedure would reflect a reasonable value, and then proceed to

look up the 75th percentile value for each listed service in his database sources.  Rather, it

appears that where Mr. Morris found that his own estimates of reasonable value differed from

information in his databases, he would ignore the database information and defer to his own

estimates:

> A: . . . Because I have experience using these database sources every day, I have understandings of where those numbers might fall – where my reasonable value might fall within those percentile groupings.  My numbers typically fall within the values of 50 percentile to 95th percentile.  There may be instances where it's over the 95th percentile because [in] my experience in the community billing, that code outweighs claims data from one particular database source.
>
> Q: You just said your experience outweighs the data from one particular database source; is that right?
>
> A:  And when I believe that my experience where I bill for this code – I've billed for this code probably hundreds of thousands of times since 2000.  I know what's paid on this code routinely.  I know charges from analyzing thousands – tens and thousands of claim forms with this code in reviews that I do.  And so sometimes that data that I analyze, payer are paying greater than what's in [the database].

> [The database] is a benchmark.  Like I told you, they remove
> outliers.  [They don't] include values that are routinely paid by
> employer-based medical plans, yet I see those plans every single
> day.  I bill for them every day.  So I take into account both records.
> <u>When I can support it using a database, fantastic.  That's great.
> When not, then it's my 19 years' experience doing this for a living
> every day all day.</u>  (Emphasis added.)

The record also reflects that Mr. Morris' methodology here deviated from one he

described in a deposition in another case, *DeArmas v. Palazuelos*, in California state court in

May 2018.  In the *DeArmas* case, as here, Mr. Morris was called to testify about his calculations

regarding "the reasonable cost [of medical services] in a specific location."  Asked how he

makes such determinations, Mr. Morris talked briefly about his experience, then explained:

> But more importantly, what I do is I cross reference my
> understanding for the fees for the area with a nationally-recognized
> industry leader database called FAIR Health.
>
> FAIR Health allows you to look up CPT [billing] codes by year
> and by geographic location through the zip code to see exactly
> what other providers are billing for and what other payor sources
> are allowing for payments for that specific code.
>
> FAIR Health has over 20 billion health care claims.  It's the most
> robust database and it's the benchmark in business. . . .
>
> And that's how I became geographic specific with the coding is
> through, the provider has a place of business and their bills will
> have a zip code and then I chose that zip code to then benchmark
> it, their values, their bill charges, against FAIR Health.

Mr. Morris apparently used data from FAIR Health when drafting his initial report in this case,

but he later submitted an updated report that abandoned use of that database.  At his August 2019

deposition in this case, he testified about this change:

> Q: . . . looking through your updated report [ ], I don't see any
> instances of you listing FAIR Health as one of your sources.  Have
> you listed FAIR Health as a source for any of these tables in your
> updated report?

A:  No, sir.

Q:  Why is that?

A: Because I chose other database sources.

Q:  Why did you use FAIR Health in your initial reports in this case, but you excluded FAIR Health in your updated reports?

A:  In my updated reports, I chose different database sources that I utilize currently.

Q: Why?

A:  Because I believe that those database sources are more appropriate for my study.

Q:  And why do you believe this?

A:  Because I do.

Q:  Well, what is your basis for that?

A:  Billing and collecting thousands of healthcare claims every day.

Q:  Just based on your experience, right?

A:  Yes.

The Court concludes that Mr. Hamilton has not carried his burden of demonstrating that the methodology used by Mr. Morris is reliable.  The Rule 702 inquiry is focused on determining whether the proffered witness "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  Here, although there is little evidence in the record about the practices of experts in the field of medical billing analysis generally, the proceedings in the *DeArmas* case provide some proof of the level of intellectual rigor that Mr. Morris has previously indicated is employed in that field.  In the *DeArmas* case, Mr. Morris emphasized that the FAIR Health

database was "nationally-recognized," an "industry-leader," the "most robust," and a "benchmark" for ascertaining reasonable medical costs, and that he used the FAIR Health database as part of his methodology.  But as the exchange above demonstrates, Mr. Morris did not use the FAIR Health database in formulating his updated opinions in this case.  He offered no explanation for that deviation, other than the vague and conclusory allegation that FAIR Health was now inconsistent with his own personal experience.  Without a clearer explanation as to why Mr. Morris' conventional methodology changed between the *DeArmas* case in May 2018 and Mr. Morris' updated report in this case in August 2019, the Court is left with the conclusion that there is no apparent justification for Mr. Morris' change in methodology.

Assuming, however, that there is no particular prevailing methodology governing the field of medical billing analysis and that Mr. Morris is free to adjust his methodology from case to case, there is the additional problem that, in this case, it does not appear that Mr. Morris even followed the methodology that he described.  Mr. Morris described his methodology as involving a degree of comparison between figures he devised based on his own experience and figures reflected objectively in medical cost databases (other than FAIR Health).  But based on his testimony, it appears that the databases played no meaningful role in checking Mr. Morris' own estimations.  He testified that his estimates "typically" ranged between the 50th and 95th percentile of costs shown in the database – a surprisingly broad range in and of itself – but that sometimes, his estimates of a service's reasonable cost exceeded even the 95th percentile cost shown in the databases.  In those circumstances, Mr. Morris apparently did not seek to reconcile that discrepancy by consulting other databases or re-examine the basis for his own estimates; rather, he simply discarded the database's valuation and substituted his own.

In this regard, Mr. Morris' deposition testimony is illuminating: "When I can support [my estimate] using a database, fantastic.  That's great.  When not," he relied upon his estimate anyway.  This testimony suggests that, contrary to Mr. Morris' testimony that he employed a two-factored analysis (experience plus databases), in actuality, he simply relied upon his own experience-based estimations, whether they correlated to information somewhere in the databases or not.  In other words, he used the databases simply to "support" his own existing estimations of value, not as a separate means of deriving an independent cost valuation that could check against errors in his own estimates.  As Mr. Morris makes clear, when he could not find any objective support for his own estimations in the databases, he adopted his own estimates nevertheless.

Arguably, because there is no meaningful evidence in the record that the field of medical cost analysis has coalesced around one or a handful of generally-accepted methodologies, the Court could even overlook Mr. Morris' failure to apply the methodology he purported to use.  It may be that, among the myriad of methodologies that are used in cost analysis, a solely experience-based estimation of reasonable costs could be a commonly-used and perhaps even a reliable method.  But Mr. Morris' own testimony defeats that conclusion as well.  As Mr. Morris testified, it would be unreasonable to form opinions based solely on his own experience because "then it's just in my head and I didn't have a source."  Thus, by Mr. Morris' own testimony, a purely-experiential methodology like the one he actually performed would not be considered reliable.  Accordingly, the Court concludes that the methodology Mr. Morris actually applied is not one that is considered reliable in the field of medical cost analysis, and Mr. Morris' opinions regarding the reasonable value of the medical costs incurred by Mr. Hamilton are excluded under Rule 702.

### 2. Challenge to Mr. Lubow

Mr. Hamilton challenges Mr. Lubow's opinions regarding the reasonable value of the medical care received by Mr. Hamilton on two grounds: (i) that Mr. Lubow, as a doctor certified in internal medicine, lacks the qualifications to opine as to "the medical necessity of past or future care or treatment" of Mr. Hamilton's "orthopedic treatment"; and (ii) that Mr. Lubow improperly applied his methodology regarding the valuation of Mr. Hamilton's medical treatment because Mr. Lubow considered Medicare-allowable payment amounts even though Mr. Hamilton is not Medicare-eligible. The Court addresses the second argument first.

The Court rejects Mr. Hamilton's argument that Mr. Lubow's cost analysis methodology is unreliable because he considered the amount of payment that Medicare would provide to doctors as one of the pertinent factors. As Mr. Lubow explained, he chose the Medicare-allowable amount as the low-end boundary for his valuation assessment not because of any characteristics of Mr. Hamilton himself, but because "in Los Angeles County, at least 80% of the medical providers who regularly provide care for musculoskeletal and neurologic disorders accept the Medicare Allowable Amount as payment in full." Mr. Lubow concluded that if 80% of providers were willing to accept Medicare-allowable rates as payment in full for a given service, the Medicare rate reflected "the amount for which [that service] is usually available in the subject community," and thus, reflected the reasonable value of that service. What Mr. Hamilton himself was actually charged or what he actually paid is not relevant to Mr. Lubow's analysis. As Mr. Lubow explains "medical providers are free to charge whatever they wish to charge, [but] most accept – as payment in full – an amount that is less, often far les, than their full charge. As a result, in most instances, there is not a reasonable basis for equating the gross charge for a medical service with the . . . reasonable value for that service." Thus, the details of

how Mr. Hamilton himself arranged billing and payment to his medical providers is not a relevant component of Mr. Lubow's methodology.

Mr. Hamilton has not come forward with evidence that demonstrates that Mr. Lubow's consideration of Medicare reimbursement rates, regardless of the Medicare status of the patient, is inconsistent with generally-accepted methodologies used in the field of medical cost analysis. Nor can the Court say that there is anything patently unreasonable about Mr. Lubow's logic. And, unlike Mr. Morris' opinion, the Court understands that Mr. Lubow applied the very methodology he identified (or, at the very least, Mr. Hamilton has not argued to the contrary). In such circumstances, Mr. Hamilton has not made a *prima facie* showing of any arguable defects in Mr. Lubow's methodology, and the Court finds that Mr. Kemper's designation of Mr. Lubow with regard to this issue satisfies Rule 702.

Mr. Hamilton's other challenge to Mr. Lubow's opinions vectors away from opinions Mr. Lubow has tendered in rebuttal to Mr. Morris with regard to the valuation of medical costs. In addition to those opinions, Mr. Lubow has been proffered to opine as to additional matters regarding Mr. Hamilton's medical care. As pertinent to this argument, the Court understands Mr. Lubow to express two additional opinions (designations are those in Mr. Hamilton's motion):

**Opinion 6B:** ". . . the only medical care that can reasonably be attributed to the [auto] accident is Mr. Hamilton's March 24, 2014 Emergency Department evaluation . . . ."

**Opinion 9**: "There is not a bona fide medical necessity for the lumbar fusion surgery Dr. Kasimian has recommended and the need for the surgery is unrelated to the March 17, 2014 accident."

In other words, Mr. Lubow is offering causation opinions, opining that certain injuries (and corresponding medical treatments) sustained by Mr. Hamilton in the past or expected in the future were not and are not causally connected to the auto accident caused by Mr. Kemper.

Mr. Hamilton's challenge to both of Mr. Lubow's causation opinions is limited to the argument that, as an internal medicine doctor, Mr. Lubow lacks the qualifications to opine as to the necessity of "orthopedic treatment" that Mr. Hamilton has undergone or is expected to undergo in the future.  Beyond stating this objection, Mr. Hamilton offers no meaningful testimony, affidavits, or other evidence that suggest that medical specialties are so strictly cabined.  In any event, the Court agrees with Mr. Kemper that Mr. Lubow's qualifications are at least *prima facie* sufficient to withstand Mr. Hamilton's challenge.  Mr. Lubow's curriculum vitae indicates that, in addition to his experience in internal medicine, Mr. Lubow has "extensive practice experience in . . . emergency medicine" and is Board Certified in "Quality assurance/Utilization review."  As commonly used in the medical field, the term "utilization review" refers to a review of medical treatments that have been provided to a patient to ensure that the treatments were appropriate and necessary for the patient's condition and symptoms.  Mr. Lubow's experience in these areas would thus arguably qualify him as an expert to opine as to the degree and extent of treatment that was warranted based on Mr. Hamilton's appearance at the Emergency Department on March 24, 2014 following the accident, and more generally, the extent to which the medical services that Mr. Hamilton has received to date are consonant with the symptoms he has reported and the testing he has received.  In essence, Mr. Lubow's opinions are precisely within the sphere of "utilization review," and Mr. Hamilton's motion does not dispute Mr. Lubow's qualifications to offer opinion testimony in that field.

Accordingly, Mr. Hamilton's motion to exclude the testimony of Mr. Lubow is denied.

### E.  Khybar Zaffarkhan (Docket # 133)

Finally, Mr. Kemper moves to exclude the testimony of Mr. Zaffarkahn, a "life care planning" expert.  Mr. Zaffarkahn opines generally that, due to injuries sustained in the accident, Mr. Hamilton will incur roughly $1.65 million in costs for future medical care and services.  Mr. Kemper moves to exclude Mr. Zaffarkahn's testimony pursuant to Rule 702 because: (i) Mr. Zaffarkahn's opinions regarding the causation of Mr. Hamilton's future medical needs are not based on a reliable application of a methodology because Mr. Zaffarkahn was unaware that Mr. Hamilton suffered a work-related injury on April 18, 2014 and that injury (referred to as the "pike incident") is the actual cause of some or all of Mr. Hamilton's future medical needs; (ii) Mr. Zaffarkahn's estimates are not reliable because he has speculated about whether Mr. Hamilton will need have a spinal cord stimulator implanted; (iii) Mr. Zaffarkahn failed to reliably apply his methodology because he counted both the cost of surgery to alleviate pain <u>and</u> the perpetual cost of pain medication for the same injury; (iv) Mr. Zaffarkahn does not explicate any methodology supporting his opinion that Mr. Hamilton will need bi-weekly housecleaning services for the remainder of his life; and (v) Mr. Zaffarkahn has not articulated any methodology for his opinion that Mr. Hamilton will require monthly pain management consultations for the remainder of his life.

### 1.  The causation opinion

Although nothing in Mr. Zaffarkahn's report specifically refers to questions of causation, implicit in Mr. Zaffarkahn's opinion is that the March 2014 auto accident is the sole cause of the medical needs that Mr. Hamilton will have in the future.  Mr. Kemper, on the other hand, contends that the pike incident in April 2014 is an independent cause of some (unspecified) portion of those injuries and takes issue with Mr. Zaffarkahn's failure to consider that incident in

his determination of causation.  The entirety of the record on this point consists of a single

exchange from Mr. Zaffarkahn's deposition that reads, in pertinent part:

> Q:  So in forming your opinions, you haven't given any
> consideration to whether that pike event that you are describing in
> Dr. Fenison's note, you haven't given any consideration whether
> that's the cause of Mr. Hamilton's complaints, have you?
>
> [. . .]
>
> A:  Well, as a result of that panel evaluation, the evaluator felt at
> the time we examined him that it wasn't contributory to it, and it
> didn't cause any new or additional problems.  So I just went on the
> examiner of that date.

The identity and significance of "Dr. Fenison" and the "panel evaluation" referenced in Mr.

Zaffarkahn's answer are not elaborated upon and remain unclear to the Court.  As best the Court

can conclude, Mr. Zaffarkahn is relying upon the conclusion of other experts that Mr. Hamilton's

present medical condition is not caused in any way by the pike incident.

As with Mr. Smith's opinions discussed above, Mr. Zaffarkahn's opinion is built upon an

assumption.  In this case, that assumption is derived from the work and opinions of another

person – Dr. Fenison and/or the "panel evaluator" – that the auto accident with Mr. Kemper is

the sole cause of Mr. Hamilton's present medical condition.[13]  As with Mr. Smith's opinions, if

Mr. Kemper presents evidence that undercuts the accuracy or reliability of the underlying

Fenison/panel evaluator opinion, Mr. Hamilton will ultimately have to convince the factfinder

that the causation assumption that Mr. Zaffarkahn has adopted is itself sound and persuasive

before the factfinder will be able to credit Mr. Zaffarkahn's own opinions about the cost of future

---

[13]    Because this Court has not been supplied with the opinions stated by Dr. Fenison or the
panel evaluator, the Court cannot say whether that opinion specifically addresses the question of
whether particular injuries sustained by Mr. Hamilton are specifically traceable to the auto
accident, the pike incident, and/or some other cause. To the extent that Fenison/panel opinion is
not so direct and specific, the question of admissibility might change.

medical services.  It may be that Mr. Hamilton will ultimately have to call Dr. Fenison or the panel evaluator to express and defend the very causation opinions that Mr. Zaffarkahn relies upon if Mr. Hamilton intends to have the factfinder credit Mr. Zaffarkahn's own opinions.  But as with Mr. Smith, the question vis-a-vis Mr. Zaffarkahn's opinions is ultimately one of weight, not admissibility.  Thus, the Court denies Mr. Kemper's request to exclude Mr. Zaffarkahn's opinions on this point.

### 2.  Speculation about future medical needs

Mr. Kemper challenges that component of Mr. Zaffarkahn's opinion that Mr. Hamilton will require implantation of a spinal cord stimulator roughly 20 years from now to combat "adjacent-level disease," a condition that causes vertebrae adjacent to an existing spinal fusion to degrade more rapidly.  Mr. Kemper contends that Mr. Zaffarkahn's opinion as to whether such a device will be required in 20 years is simply speculative.

The only record before the Court on this point are fragments of testimony from Mr. Zaffarkahn's deposition.  Mr. Zaffarkahn testified that, according to his understanding, "the incidence of adjacent-level disease is approximately three percent per year after a fusion surgery such as this."  Asked to clarify whether that meant that, "with each passing year, . . . an additional three percent of people experience or will experience adjacent-level disease after a spinal fusion procedure," Mr. Zaffarkahn answered "yes."  Thus, he concluded that it was more likely than not that Mr. Hamilton will experience adjacent-level disease by the time he reaches age 61 – a point that will occur about 15 years from the 2014 accident.

Mr. Kemper argues that Mr. Zaffarkahn's assumption that Mr. Hamilton will experience adjacent-level disease in the future is "speculative," but the record reflects that Mr. Zaffarkahn has explained his rationale for that conclusion: that the incidence of adjacent-level disease

increases by 3% each year after a fusion surgery, and that within 15-20 years, Mr. Hamilton will thus be more likely than not to suffer that disease. The nature of Mr. Kemper's questioning during Mr. Zaffarkahn's deposition suggests that Mr. Kemper believes those figures are inaccurate and that "most studies on adjacent-level disease put the the people experiencing that syndrome at something less than 20 percent" of all fusion patients, but Mr. Zaffarkahn denied having any familiarity with such studies and Mr. Kemper has not come forward with any evidence that such studies exist or that the 20% figure is generally-accepted in the medical community (or that the 3% per year figure is not generally-accepted). Thus, once again, the dispute over Mr. Zaffarkahn's opinion on this point is one of weight, to be determined by the factfinder.

### 3. Expenses for both pain and surgery

Next, Mr. Kemper argues that Mr. Zaffarkahn failed to reliably apply his methodology because he included both the lifetime cost of pain medications that Mr. Hamilton takes for back pain as well as the cost of a future surgery that Mr. Hamilton is likely to undergo to alleviate that back pain. Mr. Zaffarkahn estimated that Mr. Hamilton will require the medication Butrans for pain control, at an annual cost of roughly $8,300, for the remainder of his life. But he also acknowledged that a Dr. Kasimian had recommended that Mr. Hamilton undergo a lumbar fusion surgery that would be expected to reduce his lumbar pain, and Mr. Zaffarkahn included the cost of that surgery in his opinion as well.

At his deposition, Mr. Zaffarkahn was asked about that apparent inconsistency:

> Q: [W]ell, if his pain is reduced in his low back [because of the surgery], what would be the purpose of the Butrans that you've included in your line item under your pharmaceutical section of your life care plan?

A:  Sure, so the Butrans medication is present because at the time of the examination, he was using the medication because his low back pain was 7/10.

The fusion surgery isn't gong to be happening for another 10 years. . . So because the lumbar fusion surgery isn't happening for another 10 years, there is still 10 years where he's going to have this pain, and during that time, as the cervical adjacent-level disease is going to be coming on, there is likely going to be pain associated with that, which is why I felt there is still going to be continued pain with continued need for a narcotic medication for this man.

It is not entirely clear to the Court whether Mr. Zaffarkahn's answer concedes that, once the lumbar fusion surgery is performed in about 10 years, Mr. Hamilton's need for Butrans will cease (such that Mr. Zaffarkahn concedes that projecting the cost of that medication over Mr. Hamilton's lifetime, rather than only 10 years, was an error) or whether Mr. Zaffarkahn is stating that Mr. Hamilton's <u>cervical</u> adjacent-level disease will warrant ongoing Butrans treatments even after his <u>lumbar</u> fusion surgery is performed.  To the extent that Mr. Zaffarkahn concedes that there is an error in his report, the Court is confident that the parties can agree upon Mr. Zaffarkhan submitting a revised report that corrects that error.  To the extent that Mr. Zaffarkahn believes that Mr. Hamilton will indeed need to continue taking Butrans for the remainder of his life regardless of surgical treatments, Mr. Zaffarkahn has stated the reasons for that opinion as well – that "the cervical adjacent-level disease is going to be coming one [and] there is likely going to be pain associated with that," warranting "continued need for a narcotic medication." Mr. Kemper has not come forward with evidence that suggests that Mr. Zaffarkahn's methodology for deriving that particular opinion is unreliable or otherwise in error.  Thus, the appropriateness of that opinion presents a question of weight reserved to the factfinder, not a question of admissibility under Rule 702.

4. Housecleaning and pain management

Finally, Mr. Zaffarkahn's estimate of Mr. Hamilton's future medical-related expenses includes the cost of bi-weekly housecleaning services and monthly pain management consultations for the remainder of Mr. Hamilton's lifetime.  Mr. Kemper argues that Mr. Zaffarkahn has not set forth a methodology that supports either of these expenses.

Mr. Kemper is correct that neither Mr. Zaffarkahn's report, nor the portions of his deposition in the record, nor the contents of Mr. Hamilton's response brief articulate the methodology that Mr. Zaffarkahn used in reaching these opinions.  Although the methodology that Mr. Zaffarkahn may have used to calculate these expenses – an estimated bi-weekly or monthly cost multiplied by Mr. Hamilton's remaining expected lifespan – is obvious, the record does not disclose Mr. Zaffarkahn's predicate rationale as to why such services are necessary.  He does not, for example, testify as to why Mr. Hamilton is unable to perform his own housecleaning (much less correlate that inability to injuries sustained as a result of the auto accident), nor does he explain why pain management consultations will be expected to continue after Mr. Hamilton undergoes expected surgeries.  Because Mr. Kemper has properly identified an apparent lack of methodology supporting the conclusion that these expenses were appropriate in the circumstances presented here, and Mr. Hamilton has not carried his burden of identifying any such methodology, the Court grants Mr. Kemper's motion and excludes any opinions by Mr. Zaffarkahn relating to expenses for housecleaning services or pain management consultations.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** Mr. Kemper's Motions to Exclude (**# 133, 135, 136, 138**) certain opinion testimony from Mr. Zaffarkahn, Ms. Jackson, Mr. Pietruszka, and Mr. Morris as set forth herein.  The Court **DENIES** Mr. Kemper's Motion to

Exclude (**# 134**) testimony from Mr. Smith and Mr. Hamilton's Motion to Exclude (**# 137**) testimony from Mr. Lubow.  The Court **DENIES AS MOOT** the motions at Docket # 118 and 119 and **GRANTS** the motion at Docket # 141.

Dated this 16th day of April, 2020.

**BY THE COURT:**

Marcia S. Krieger
Senior United States District Judge